UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

-------------------------------------------------------------------X

A.S.[1],

                Plaintiff,

           v.

UNITED STATES OF AMERICA,

                Defendant.
-------------------------------------------------------------------X

Case No.   1:26-cv-00372

**COMPLAINT**

Plaintiff A.S., by and through her attorneys, Shaffer & Shaffer PLLC and Wang Hecker LLP, alleges as follows:

### NATURE OF THE ACTION

1.      In November 2023, while A.S. was incarcerated at the Federal Bureau of Prisons ("BOP") federal prison camp in Alderson, West Virginia ("Alderson"), she was raped by Corrections Officer James Bennett.  Bennett sexually harassed A.S. for months leading up to the assault.  After the assault, he intimidated and further harassed her with threats and coercion.  This pattern only subsided when Bennett was reassigned to a different building at Alderson.

2.      Bennett was arrested on September 4, 2024 and charged with sexually abusing A.S. and two other women who were likewise incarcerated at Alderson.  His trial is scheduled for July 2026.  *See United States of America vs. James Bennett*, 24 Cr. 139 (S.D.W.V.), Dkt. No. 83.

---

[1] Plaintiff is using the initials "A.S." in this Complaint in place of her real name.  It is necessary to proceed pseudonymously for her privacy as a sexual assault victim.  It is also necessary because she fears that her name being disclosed publicly would result in retaliation by prison officials.

3.      The assault and harassment that A.S. suffered occurred as a direct result of the negligence and deliberate indifference of the BOP and its employees.  Bennett used his position of power as a corrections officer to prey on A.S. because he understood that he could do so with impunity.

4.      The BOP and its employees had notice of the high incidence of sexual abuse in BOP facilities and notice that Bennett in particular posed a serious risk to women at Alderson. Before A.S.'s assault, BOP employees observed Bennett's inappropriate behavior towards A.S. and others.  They also knew or should have known that Bennett sexually assaulted at least one other woman at Alderson, in June 2023, six months before he sexually assaulted A.S.

5.      Despite these obvious risks, the BOP and its employees took no steps to prevent Bennett from sexually abusing A.S. or other incarcerated women, including and without limitation by ensuring the implementation of policies or procedures to protect A.S. and/or to terminate, discipline, investigate, and/or otherwise supervise or manage Bennett to ensure that he would not rape or sexually assault A.S.

## JURISDICTION AND VENUE

6.      This action arises under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq. This Court has jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1346(b).

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as all or a substantial portion of the acts and transactions giving rise to Plaintiff's claims occurred in Summers County, West Virginia.

8.      Plaintiff submitted an Administrative Claim to the BOP for the claims against the United States of America set forth below, which was received by the agency on July 23, 2025.

9.      More than six months have passed, and the BOP has not responded to A.S.'s Administrative Claim.

10.     Accordingly, all conditions precedent to a Federal Tort Claims Act action in this Court have been met.

## PARTIES

11.     Plaintiff A.S. was at all relevant times in the custody of the Federal Bureau of Prisons ("BOP"), an agency of the United States.  She was incarcerated at Alderson from June 2023 through May 2024 and is currently incarcerated at Federal Medical Center, Lexington, in Lexington, Kentucky.

12.     Defendant United States was at all relevant times responsible for the BOP, which at all relevant times operated Alderson and employed Bennett, as well as Alderson staff who negligently failed to take any steps to prevent Bennett from raping and sexually abusing A.S. and other women at Alderson.  Defendant United States is sued under the Federal Tort Claims Act for the wrongful and tortious acts of its employees.

## FACTUAL ALLEGATIONS

**Systemic Sexual Assault in the Corrections System and at Alderson**

13.     Sexual violence by corrections staff is endemic in United States prisons.  In a 2024 United States Department of Justice ("DOJ") survey, nearly 27,000 incarcerated people reported that they had been sexually abused by corrections staff in the previous year.  *See* Michael B. Field, et al., U.S. Dep't of Just., Bureau of Just. Stat., NCJ-310544, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2023–24*, at 3 tbl.1 (2025).

14.     DOJ data further suggest that the vast majority of these individuals never report their abuse to prison administrators or law enforcement.  *Compare* Emily D. Buehler, et al., U.S.

Dep't of Just. Bureau of Just. Stat., NCJ-308553, *Sexual Victimization Reported by Adult Correctional Authorities, 2019–20* (2024) (describing the total number of sexual victimization allegations against corrections staff reported to facilities over time) *with* Michael B. Field, et al., U.S. Dep't of Just., Bureau of Just. Stat., NCJ-310544, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2023–24* (2025) (describing the far larger number of incarcerated individuals who reported in surveys that they had been sexually victimized by corrections staff). That is because many incarcerated individuals who are victimized by corrections staff fear retaliation, including discipline, unwanted transfers to other facilities, and loss of privileges.  In fact, A.S. herself feared punishment profoundly, and therefore did not feel safe reporting Bennett's sexual assault to officials until the Office of the Inspector General ("OIG") reached out to interview her during its investigation into another sexual assault by Bennett, having learned of her assault from other incarcerated individuals.  *See also* Emily D. Buehler, et al., U.S. Dep't of Just. Bureau of Just. Stat., NCJ-308553, *Sexual Victimization Reported by Adult Correctional Authorities, 2019–20*, at 19 tbl.12 (2024) (showing that sexual victimization by corrections staff is typically reported by someone other than the victim).

15.    The BOP is well aware of this widespread problem.  In response to rampant sexual abuse in federal facilities, Congress passed the Prison Rape Elimination Act ("PREA") in 2003.  The Act requires the BOP to maintain enumerated policies and practices to protect incarcerated individuals from sexual violence, and to conduct periodic audits of federal facilities.

16.    Yet despite the passage of the PREA, the BOP has not come close to adequately addressing the issue, and sexual abuse in federal prisons continues to be a widespread and pervasive problem.  A 2022 United States Senate investigation found that the BOP failed to "take agency-wide action to address sexual abuse of female inmates by male BOP employees."  U.S.

4

Senate Comm. on Homeland Sec. & Gov't Aff's, *Sexual Abuse of Female Inmates in Federal Prisons* 28 (2022).  The BOP did not appropriately conduct PREA audits, analyze audit data, timely investigate sexual abuse complaints by incarcerated individuals, or hold sexually abusive corrections staff accountable.  *Id.* at 19–26.  The committee determined that "[t]he agency's poor implementation of the audit program and reporting mechanisms required by PREA allowed serious, repeated sexual abuse in at least four facilities to go undetected," *id.* at 30, and that corrections officers had sexually assaulted incarcerated women in at least two thirds of women's federal prisons since 2012, *id.* at 2.

17.    Alderson is a minimum-security federal prison that houses approximately 700 women, and it is not immune from these nationwide patterns.  In 2018, Alderson Captain Jarrod Grimes was criminally convicted of sexually assaulting six women incarcerated at Alderson.  Between May 2023 and May 2024, the year that Bennett assaulted A.S. and at least two other women, 11 allegations of sexual abuse of incarcerated women were lodged against Alderson staff.  Lori Fadorick, Prison Rape Elimination Act (PREA) Audit Report, FPC Alderson, 2024.  Upon information and belief, BOP officials at Alderson have investigated Bennett for multiple sexual assaults.

**Background on A.S.**

18.    A.S.'s childhood was tumultuous.  Both of her parents abused drugs and alcohol, often in A.S.'s presence, and they separated when A.S. was young.  Her mother later began a relationship with a violent man, and the family spent much of A.S.'s early years on the run from the boyfriend's abuse.

19.    A.S. was sexually abused multiple times during her childhood and young adulthood.  She feared that if she disclosed the abuse to anyone, she would be dismissed and

disbelieved, having been told as much by her abusers.

20.     When A.S. was a young adult, she began dating and later married an older man who pulled her into addiction and the drug trade.  A.S. has been incarcerated since 2017 for a drug-trafficking offense.  She has remained sober and separated from her husband since then.

**Harassment and Assault by Bennett**

21.     A.S. arrived at Alderson in June 2023.  Shortly after her arrival, A.S. heard rumors that Bennett had a practice of engaging in sexual activity with women incarcerated at the facility. The women incarcerated at Alderson discussed his sexual misconduct openly and frequently. A.S. also heard that Bennett once coerced a woman into performing oral sex in exchange for avoidance of a disciplinary infraction.

22.     Bennett often stared at A.S.'s body and made sexual comments and jokes.  For instance, Bennett approached A.S.'s cell unannounced and told her that he "like[d] the view from here" and that A.S. "look[ed] good bent over."  Sometimes when Bennett made sexual comments, he used his body to block A.S. from leaving her cell.  Bennett also made flirtatious comments towards other women at Alderson and openly gave A.S. and those women preferential treatment, including exempting their cells from routine searches.

23.     A.S.'s interactions with Bennett made her extremely uncomfortable.  But she did not believe that Bennett was dangerous or that he would ever force himself on her.  She tried to deflect and laugh off his advances, hoping that he would move on and focus his attention elsewhere.

24.     Bennett's harassment escalated in approximately the fall of 2023.  When another Alderson corrections officer threatened to write up A.S. for a disciplinary infraction, Bennett

6

intervened to help her, telling A.S. afterward that she should feel indebted to him for preventing her from being disciplined, and reminding her that he could get her in trouble if he wanted to.

25.     Bennett also told A.S. that he and A.S. could be "more than just friends" and that he could "make her life easier."

26.     These exchanges alarmed A.S.  She began more firmly to reject Bennett's advances, even telling him directly to leave her alone.

27.     Bennett did not listen.

28.     In or around November 2023, Bennett called A.S. out of her cell and into a hallway of administrative offices.  A.S. believed that Bennett was taking her to an office to meet with her assigned counselor.

29.     Instead, to her horror, he began to hug and kiss her in the empty hallway.  Bennett reminded A.S. that he had prevented her from being disciplined and offered to bring contraband into the prison for her.  When A.S. told Bennett that she was not interested and attempted to back away and turn her face away from him, he cornered her against a wall and accused her of "playing hard to get."

30.     Bennett then led A.S. into a bathroom, where he pulled her pants down, inserted his fingers into her vagina, and then raped her.  As Bennett assaulted A.S., he lifted her shirt and groped her breasts and stomach.  A.S. also felt him attempt to penetrate her anally.

31.     A.S. did not consent to any sexual contact with Bennett, nor could she under federal law.  But when A.S. attempted to push Bennett away, he said, "you wouldn't assault an officer, would you?"  A.S. interpreted this comment as a clear message that if she screamed or pushed Bennett again, he would accuse her of assaulting an officer.  She felt hopeless, knowing that nobody would believe her if she reported the assault, a feeling that she had felt many times

before.  In addition to her history of sexual abuse, A.S. repeatedly had been physically assaulted by officers at a prior prison and had never been helped or believed by other officers.

32.     She therefore feared that if she forcefully resisted Bennett, he would use his authority to get her in trouble, or he would hurt her more.

33.     Instead, she remained frozen and waited for the assault to end.

34.     The assault left A.S. with vaginal pain and bleeding, as well as intense emotional distress.  She felt violated, dirty, scared, and appalled.  She struggled with anxiety and depression and had persistent nightmares and trouble sleeping.  Her distress was so severe that the Alderson medical center prescribed her an anti-depressant.

35.     A.S.'s trauma was compounded by the fact that Bennett continued to sexually harass her.  For weeks after the assault, he repeatedly sought her out and pressured her to submit to more sexual activity, often asking her if she had "reconsidered."

36.     When A.S. refused, Bennett changed tactics.  Shortly after the assault, Bennett searched A.S.'s cell and told her that he had "left [her] a present" in her locker.  A.S. then opened her locker to find a vape pen that did not belong to her, as Bennett stood by smirking.  Being found in possession of such contraband carried with it serious punitive consequences.  Bennett snidely remarked to A.S., in sum and substance, "look how easy it was for me to do that."  Bennett's punitive threat was clear:  if A.S. did not submit to Bennett's sexual overtures, he would use his power and authority to make sure she suffered.

37.     This campaign of pressure and veiled threats made A.S. feel profoundly powerless and greatly exacerbated her distress.  She was terrified that Bennett would again isolate and rape her.  She feared, as she had when she was sexually abused as a child and young adult, that no one

would believe her if she reported the assault and harassment. Bennett had told her as much. Instead, she confided in a close friend who was also incarcerated.

38.    The harassment subsided only when Bennett was reassigned to another building several weeks later.

39.    Approximately a month after Bennett's reassignment, the OIG began investigating him for his June 2023 sexual assault of another woman at Alderson.

40.    In February 2024, the OIG interviewed A.S. after hearing about her assault through another incarcerated woman in whom A.S. had confided. A.S., although she was still afraid of reprisal and being disbelieved, found the courage to disclose the assault to the OIG. The OIG's investigation also uncovered that Bennett had sexually assaulted a third woman at Alderson in January 2024.

41.    Upon information and belief, Bennett sexually assaulted and abused at least four women at Alderson in addition to A.S., including before he assaulted A.S.

42.    Upon information and belief, at the time that A.S. was assaulted, the BOP and its employees knew or should have known about the June 2023 assault but failed to take any action to protect A.S. and others from Bennett.

43.    Upon information and belief, the BOP and its employees knew or should have known about the rumors that Bennett had sex with women incarcerated at Alderson and that he had coerced a woman into performing oral sex. Upon information and belief, the BOP and its employees had an obligation to thoroughly investigate these rumors but failed to do so.

44.    Upon information and belief, the BOP and its employees observed Bennett's harassing and inappropriate behavior towards A.S. and others but did not take any action in response.

45.     In fact, at least one BOP supervisor acknowledged to A.S. that she was aware of Bennett's reputation.  Approximately one to three months after A.S.'s assault, A.S. discussed a possible transfer to another prison with Alderson Unit Manager Dillon-Hill.  Dillon-Hill expressed anger at A.S. for reporting the assault to OIG and accused A.S. of lying.  She told A.S., in sum and substance, that Bennett "could get any woman he wants" and stated, "I know how you girls talk about him."  Dillon-Hill then threatened to transfer A.S. to the federal prison camp in Dublin, California—a facility notorious for high rates of sexual abuse by staff—and told A.S., in sum and substance, that "it could be worse."  Dillon-Hill thus made clear both that she knew that Bennett was a threat to the women at Alderson, and that she did not care.

46.     Further, long before A.S. arrived at Alderson, the BOP was aware that women incarcerated at the facility were in danger of sexual abuse, yet failed to take sufficient steps to prevent it.  The BOP knew of the rampant sexual abuse of incarcerated women by BOP officials across its facilities, and it knew that multiple women at Alderson had reported sexual abuse by Alderson staff, including Grimes, the Alderson Captain convicted in 2018 of sexually assaulting six women at Alderson.

47.     Upon information and belief, Grimes's *modus operandi* for targeting his victims was strikingly similar to Bennett's.  Upon information and belief, before abusing his victims, Grimes would seek them out during their daily activities and make sexually suggestive comments to them.  He would then systematically isolate and sexually assault them.  Upon information and belief, Grimes discouraged his victims from reporting the assaults by telling them that no one would believe them and/or that he would use his position of power to retaliate against them.  After Grimes's conviction, the BOP had a heightened obligation to ensure that women incarcerated at Alderson were protected from this type of predatory behavior.  Yet

approximately five years after Grimes's conviction, the BOP had yet to implement policies and procedures sufficient to prevent similar victimization of incarcerated women at Alderson, thereby allowing Bennett to harass and rape A.S.

48.    A.S. was deeply harmed and traumatized by Bennett's assault and harassment.  In addition to her painful physical injuries, these experiences have caused A.S. depression and anxiety so severe that she was prescribed medication.  Those close to her have commented since the assault that she seems more withdrawn.  The assault has also caused significant sleep disturbances, including difficulty sleeping and frequent nightmares.  A.S. was prescribed a sleeping pill to mitigate these symptoms approximately eight months after the assault.  Although it afforded her little relief, she was too traumatized to request a prescription for a stronger medication, because she feared being incapacitated and unable to defend herself at night.  A.S. ultimately transferred to another prison, significantly disrupting her life and routine, in an effort to alleviate her extreme distress.  But she continues to suffer from the severe emotional impact of the harassment and assault.

## FIRST CAUSE OF ACTION
### (Negligence)
### (Federal Torts Claim Act)
### (Against Defendant United States)

49.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

50.    The United States and its employees had a duty of care to A.S. while she was incarcerated at Alderson.

51.    Employees of the United States knew or should have known that female prisoners at Alderson, including A.S., were likely to be sexually harassed and assaulted.

11

52.     Employees of the United States knew or should have known that Bennett was likely to engage in unlawful conduct that injured A.S.

53.     Employees of the United States acted negligently in hiring, training, retaining, and/or supervising Bennett.

54.     Employees of the United States acted negligently in failing to take reasonable steps to prevent female prisoners at Alderson, including A.S., from being sexually harassed and assaulted.

55.     Employees of the United States were acting within the scope of their employment for the United States when they engaged in these negligent acts and/or omissions.

56.     As a result of that negligence, A.S. was sexually harassed and assaulted by Bennett, and suffered damages, including severe emotional harm and physical injuries.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests that judgment be entered against Defendant for any and all compensatory and special damages incurred by A.S., including but not limited to physical pain and suffering, past and future mental anguish and emotional distress, reduced capacity to function as a while person, past and future medical expenses, court costs, post-judgment interest, and any and all other relief that the Court may deem just and proper.

Dated: Charleston, WV
        May 30, 2026

By:  /s/ *Todd A. Mount*
Todd A. Mount (WVSB #6939)
SHAFFER & SHAFFER, PLLC
2116 Kanawha Blvd. East
Charleston, West Virginia 25311
(304) 344-8716
tmount@shafferlaw.net

12

WANG HECKER LLP
Mariann M. Wang*
Heather Gregorio*
Maggie Hadley*
111 Broadway, Suite 1406
New York, New York 10006
(212) 620-2600
mwang@wanghecker.com
hgregorio@wanghecker.com
mhadley@wanghecker.com

*Pro hac vice applications forthcoming

*Attorneys for Plaintiff A.S.*

13